2020 IL App (1st) 180712-U

FOURTH DIVISION
August 13, 2020

No. 1-18-0712

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 13900 |
| DEONTE LOGAN, | ) ) | |
| Defendant-Appellant, | ) ) | Honorable Timothy J. Joyce, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirming the judgment of the circuit court of Cook County where (1) the error of admitting hearsay testimony did not rise to the level of plain error and (2) the trial court conducted an adequate inquiry into defendant's claims of ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant Deonte Logan was found guilty of first-degree murder for the shooting deaths of John and Willie Hunter. Defendant was sentenced to a natural life in prison. On appeal, defendant raises two claims: (1) the trial court should have granted him a

new trial where the State presented only hearsay testimony linking defendant to the residence where fired cartridge casings were discovered and (2) the trial court failed to conduct an adequate inquiry into defendant's posttrial claims of ineffective assistance of counsel. For the reasons which follow, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4      Defendant was indicted for numerous counts of the first-degree murder of two brothers, John and Willie Hunter, on July 5, 2015.

¶ 5      The evidence at trial established the following facts. John and Willie were visiting Chicago from Missouri for the Fourth of July weekend. They had previously lived in Chicago and on this visit, they were staying with their friend Kenneth Davis. On July 4th, they attended a barbeque hosted by their cousin, Bridgette Ersery. John, Willie, Bridgette, her mother Bonita, Kenneth, his girlfriend Keiona Seymour, and a friend Antonio Brady were in attendance. At 12:30 p.m. Kenneth and Keiona left the barbeque. Around 6 p.m. John, Willie, Bridgette, Antonio, and John's young daughter Nila, drove in John's rented Chevy Tahoe to a block party that was being held between 51st Street and 47th Street on Princeton. John and Willie had previously resided in that neighborhood and had friends who lived there. Kenneth and Keiona drove separately from the group and joined them at the block party.

¶ 6      While John, Willie, and their friends were all together on 51st Street, an altercation broke out. As a result, they moved down to 47th Street. It was here that a different altercation ensued between defendant and a large group of people. Keiona testified regarding the commencement of the altercation on 47th Street as follows. According to Keiona, when she recognized defendant at the block party, she approached him and they began talking. Shortly thereafter, defendant grabbed her and held her like a human shield while seven or eight men pointed

handguns in their direction. She and defendant fell to the ground. Kenneth testified he witnessed defendant holding Keiona and when they fell down, he grabbed Keiona to help her up. According to Kenneth, this assistance made those individuals who were holding handguns believe that he was assisting defendant and Kenneth was then struck with a pistol twice in the face. Keiona went toward her vehicle to escape and she began arguing with Kenneth over who would drive. While Keiona and Kenneth were arguing, defendant was attempting to enter their vehicle. Keiona testified that she yelled at defendant to get out of the vehicle, but he did not listen. Soon, however, Kenneth, Keiona, a co-worker of Keiona's, and defendant were pulled from the vehicle by the same group of men with weapons who had previously attacked defendant. These individuals then searched the automobile taking money, a cell phone, and a tablet. They also forcibly moved defendant into an alley where his clothes were removed, and he was beaten. Antonio testified that he and John went to help defendant but were told that if they did more harm would come to them. Willie was not present when defendant was being attacked.

¶ 7     After defendant was beaten, he entered Kenneth and Keiona's vehicle. Defendant was angry and kept asking why no one helped him. Kenneth dropped defendant off near defendant's home and then proceeded back to his own home. Antonio, John, and Willie remained at the block party for another hour.

¶ 8     Later that evening, Antonio received a phone call from defendant. Defendant was angry and was asking Antonio why he did not help him. Antonio testified that he tried to explain to defendant why he could not help, but defendant was not listening so Antonio hung up on him. When defendant called back, he was calmer and the two agreed to meet. John then drove with Antonio and Willie to meet defendant on 86th Street between Green and Sangamon Streets. They spoke with defendant and agreed to return to the block party to obtain defendant's

belongings. John, Willie, and Antonio found only one of defendant's sneakers.

¶ 9    John, along with Willie, Brittany (Willie's girlfriend), Antonio, and Nila, then drove to Kenneth's house where John spoke with Kenneth for half an hour. Keiona expressed that she needed some cigarettes, so John asked her to join them. After obtaining cigarettes at a nearby gas station, John dropped Keiona, Brittany, and Nila off at 6 a.m. at Bridgette's house and told Brittany he would be right back.[1]

¶ 10    At some point thereafter, defendant called Antonio and told him to meet him at 88th Street and Bishop Street. John was driving with Antonio in the front passenger seat and Willie was seated behind John in the back-passenger seat. When they arrived at 88th and Bishop, Antonio exited the vehicle and turned around to obtain defendant's shoe from the back seat. As he was turned back, Antonio testified he heard six gunshots and observed defendant shooting. Defendant then grabbed his shoe from Antonio and walked away.

¶ 11    These events were recorded and memorialized on a home surveillance video. The parties stipulated to the authenticity of the video and it was admitted into evidence and published to the jury. The video depicted a male in a gray hooded sweatshirt standing in the middle of the street as a silver Tahoe approached. The Tahoe stopped and Antonio exited the front passenger side of the vehicle and turned around to obtain the sneaker. As Antonio turned back around toward the man, the man pushed Antonio out of the way, closed the front passenger door to the Tahoe, and raised his right hand into the passenger-side window. Antonio backed away and stood on the parkway. The Tahoe then drove away and the man walked toward Antonio, grabbed the sneaker out of his hand, and walked away. Antonio stood on the parkway for a moment looking back

---

[1] Antonio testified that a "cousin Ron" was in the vehicle as well. No other witness testified to "cousin Ron" being present.

and forth and then walked away in the same direction as defendant. Another angle of the surveillance video showed defendant change direction and walk the other way down the street as Antonio continued going the opposite way. Antonio identified the man in the gray hooded sweatshirt as defendant in court.

¶ 12     After the shooting, Antonio walked to Bridgette's house, told her to call 911 and informed her that defendant had shot John and Willie. Bridgette then went to look for John and Willie. She found their vehicle crashed into the side of a building at the corner of 89th and Ashland. Willie had died at the scene. John, who was transported to the hospital, died shortly thereafter. The parties stipulated that if called, the medical examiner would testify both John and Willie died of multiple gunshot wounds and their manner of death was homicide.

¶ 13     Evidence technicians for the Chicago Police Department testified that two .40 caliber fired cartridge casings were recovered on the street near the west curb of the 8800 block of S. Bishop. Two additional .40 caliber fired cartridge cases were discovered on the floor of the front passenger area of the Tahoe. An inventory of the Tahoe also revealed a loaded .45 caliber semi-automatic handgun was underneath the back seat.

¶ 14     Officer William Newbern testified that Antonio was at the scene of the crash when he arrived. Officer Newbern approached Antonio and asked if he had any information. Antonio relayed to him that he had witnessed the shooting and described the shooter as an African American male wearing a gray hooded sweatshirt. Antonio then agreed to go to the police station for further questioning. While there, he relayed to the detectives that as he was approaching a home on the 8800 block of S. Bishop to get some money, he heard gunshots coming from behind him, turned around and noticed two African American males wearing hooded sweatshirts with the hoods up fleeing the scene. He did not identify defendant as the

shooter.

¶ 15    Two days later, Antonio was again questioned at the police station by detectives regarding the shooting. Antonio testified that he relayed to the detectives a different story on this occasion. According to Antonio, he informed the detectives that he had exited the Tahoe to meet defendant but did not see him, so he walked up to "Little Mike's" house. As he walked up the steps to Little Mike's house, he heard gunshots behind him. After defendant shot John and Willie, he pointed his weapon at Antonio's head, pulled the trigger and it misfired.

¶ 16    Antonio also acknowledged that he testified to another version of events during his grand jury testimony. Before the grand jury, Antonio testified that he walked around the Tahoe holding defendant's shoe in his hand, got to the second or third step of a house, and heard shooting behind him. After the shooting, defendant approached him, put a gun to his head and pulled the trigger. The weapon did not fire, and Antonio dropped the shoe and took off running.

¶ 17    At trial, Antonio testified in his prison jumpsuit as he was currently incarcerated in Minnesota for a felony drug offense. Antonio acknowledged that he had previously been convicted of numerous felonies and that he had not been given anything in exchange for his testimony. Antonio testified that he had relayed multiple versions of events to the detectives but it was not until after he viewed the video surveillance footage that he told the truth. Antonio further testified he had been drinking, had smoked marijuana, and had taken ecstasy on July 4, 2015.

¶ 18    On July 14, 2015, a search warrant was executed for a single-family residence located on the 8800 block of S. Laflin Street. Over defense counsel's objection and subject to cross-examination, Detective Keith Allen testified that the location of the search warrant was defendant's residence. Detective Allen further testified the search uncovered two fired .40

caliber cartridge cases in the gangway of the residence. No evidence was recovered from inside the residence.

¶ 19    At the conclusion of Detective Allen's testimony, the trial court called for a sidebar and instructed the State to lay the proper foundation that this was defendant's residence or else it would strike this portion of Detective Allen's testimony. The questioning of Detective Allen then resumed with the State inquiring how he learned where defendant resided. Detective Allen responded, "Through his prior arrest history." Defense counsel immediately objected, and it was sustained with the trial court instructing the jury to disregard that answer. The State then inquired of Detective Allen what research he conducted to determine where defendant resided. Over numerous objections, Detective Allen testified he did a search of the Cook County Assessor's website and determined that defendant resided there. On cross-examination, Detective Allen testified as to how he performed the search and that defendant was not the owner of the property.

¶ 20    At a sidebar after Detective Allen's testimony, defense counsel moved to have the jury be instructed to disregard Detective Allen's testimony regarding defendant's residence because the foundation had not been laid. The trial court denied the motion.

¶ 21    The State rested and the defendant moved for a directed verdict, which was denied. The defense then rested without putting on any evidence. After hearing closing argument and jury instructions, the jury deliberated and ultimately found defendant guilty of two counts of first-degree murder (720 ILCS 5/9-1 (West 2016)). Defendant filed a posttrial motion for a new trial, in which he argued in pertinent part that the State failed to establish that the location of the search warrant was defendant's residence and thus failed to link the fired cartridge casings found there to him. Defendant further argued that the State elicited prejudicial testimony from

Detective Allen regarding defendant's prior arrest record. The trial court denied the motion finding that any prejudice that may have occurred as a result of the State eliciting testimony regarding defendant's prior arrest record was diminished by the instruction for the jury to disregard the testimony. The trial court further stated that any error regarding proof of defendant's residence did not warrant a new trial because the relevance of the fired cartridge casings found outside that residence was "minimal at best."

¶ 22    The matter proceeded to a sentencing hearing where the trial court heard arguments in aggravation and mitigation. When defendant was asked if he would like to speak in allocution, he informed the trial court that he would like to raise a claim of ineffective assistance of counsel. The trial court asked him to expound on that sentiment. Defendant inquired if he could present his claims in writing, but the trial court asserted that the matter had been continued several times and denied defendant's request. The following exchange then occurred:

"DEFENDANT:  Well, they didn't get the phone records of the calls they said we had back and forth with Antonio Brady and me, and she didn't impeach the witness.

THE COURT:  What witness was that, that she did not impeach?

DEFENDANT:  Antonio Brady.

THE COURT:  Antonio Brady was the gentleman who came out here in the custody of the Illinois [*sic*] Department of Corrections, correct?

DEFENDANT:  Yes.

THE COURT:  And how is it that you believe that they did not adequately impeach Mr. Brady?

DEFENDANT:  There was just a lot of things she didn't ask him, I think.

THE COURT:  Like what for example?

DEFENDANT: Like, concerning everything, the phone calls, the money. He said he was getting money from people, everything, what he was saying in the first Grand Jury indictment under oath.

THE COURT: What money are you talking about? I don't recall the specifics of that.

DEFENDANT: He switched the statement up in the Grand Jury.

THE COURT: Say that again.

DEFENDANT: He switched his statement up in the Grand Jury indictment. He said something else on the stand under oath.

THE COURT: And that was brought out by your attorneys, correct?

DEFENDANT: Yes.

THE COURT: That's what I thought. Anything else you wish to say, sir?

DEFENDANT: No, sir.

THE COURT: Pursuant to People v. Krankel and its progeny, including People v. Moore and People v. Jolly, I don't believe that Mr. Logan's claim is meritorious. So, I'm going to respectfully deny your request."

The sentencing hearing proceeded, and, upon consideration of the arguments and defendant's presentence investigation report, the trial court sentenced defendant as prescribed by statute to mandatory natural life imprisonment. This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    On appeal, defendant raises two claims: (1) the trial court should have granted him a new trial where the State presented only hearsay testimony linking defendant to the residence where the fired cartridge casings were discovered and (2) the trial court failed to conduct an adequate

inquiry into defendant's posttrial claims of ineffective assistance of counsel. We address each issue in turn.

¶ 25                                    Admission of Hearsay Evidence

¶ 26    Defendant first contends that the trial court erred in denying his motion for a new trial where the State failed to offer any admissible evidence linking him to the residence where the fired cartridge casings were discovered. Defendant maintains that he suffered prejudice from Detective Allen's hearsay testimony because the State relied on the evidence found at the residence and informed the jury it was scientific proof that defendant committed the crime. Moreover, in attempting to provide an adequate foundation for Detective Allen's testimony, the State revealed that defendant had a prior arrest record. Defendant concludes that the error in admitting the testimony of Detective Allen was not harmless and requests we reverse his conviction and remand the matter for a new trial.

¶ 27    In response, the State agrees that the evidence utilized to establish defendant's residence was not properly admitted. The State maintains, however, that defendant was not prejudiced where the evidence of his guilt was overwhelming and established by other evidence in the record.

¶ 28    Prior to addressing this issue, we observe that defendant concedes he did not properly preserve this claim for our review. Specifically, in his motion for a new trial, defendant only asserted that the admission of Detective Allen's testimony regarding the property search history was in error. See *People v. Reese*, 2017 IL 120011, ¶ 60 (to properly preserve an issue for review, a timely objection must be made, and the issue must be included with specificity in a posttrial motion). The State, however, concedes that error was committed. Thus, the question at issue here is whether this error rises to the level of plain error.

¶ 29    The plain-error doctrine permits this court to consider an unpreserved error when either (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear and obvious error occurs and that error is so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The burden of persuasion remains with the defendant under both prongs of the plain-error test. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 30    Defendant asserts that the evidence here was closely balanced because without the fired cartridge casings found outside of the residence, the result of the trial hinged solely on the credibility of Antonio. According to defendant, the State failed to establish a link between defendant and the residence, but the jury nonetheless heard the State argue in closing that the fired cartridge casings recovered were scientific proof that defendant was guilty. The State relied on this link to bolster Antonio's testimony and as substantive evidence of defendant's guilt. Defendant claims that, in the minds of the jurors, the improper hearsay evidence linking him to the residence and the fired cartridge casings found there may have tipped the scales in favor of conviction as the other evidence adduced by the State at trial was not overwhelming.

¶ 31    The State argues that the evidence was not closely balanced. The State asserts that Antonio testified he had known defendant prior to the shooting and further testified consistently with the surveillance video that captured the shooting in which he identified himself and defendant on the video. In addition, Antonio identified when the shooting occurred and the fact that he was holding the defendant's sneaker in his hands at the time of the shooting. Antonio then had the sneaker taken from him by the shooter and the only person with a reason to do so

was defendant because it was his sneaker. The State further argues that the fired cartridge casings discovered at the residence were merely cumulative considering Antonio's testimony establishing defendant's guilt as the shooter. The State notes that Antonio was forthcoming in his testimony regarding his alcohol and drug use prior to the shooting, his prior felonies, and his inconsistent statements regarding the events of July 5th. According to the State, the jury could view the surveillance video for themselves, which corroborated Antonio's testimony. Lastly, the State asserts that trial counsel was able to minimize the impact of the inadmissible testimony through effective cross-examination.

¶ 32    We agree with the State that the evidence was not closely balanced in this case. In *People v. Sebby*, 2017 IL 119445, our supreme court determined the evidence was closely balanced where "[t]he deputies' testimony was largely consistent, but so was the testimony of the defendant and his witnesses" and no other evidence was presented other than the testimony. *Id.* ¶ 61. The supreme court stated the outcome of the case turned on how the fact finder resolved a " 'contest of credibility.' " *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). Our supreme court concluded the evidence was closely balanced because neither party presented extrinsic evidence to corroborate or contradict either version and because both versions were credible. *Id.*

¶ 33    Unlike *Sebby*, this case did not boil down to a credibility contest between conflicting, credible accounts of the alleged crime. Even excluding the fact that two .40 caliber fired cartridge cases were discovered in the gangway of defendant's residence, the evidence demonstrated defendant committed the offense. The State presented evidence that defendant, who was known to Antonio prior to the shooting, had been beaten and humiliated on the evening of July 4th. Defendant was angry and expressed his anger to John, Willie, Antonio, Kenneth,

and Keiona over their lack of assistance during the beating. After defendant spoke with John, Willie, and Antonio, the trio went back to 51st and Princeton to obtain defendant's belongings. They only found one of defendant's sneakers. They then met with defendant to bring him what they had recovered. Antonio testified that he exited the Tahoe, went to get the sneaker from the back seat, and as he turned around, he heard gunshots and observed defendant shooting. Defendant then walked over to Antonio, grabbed the sneaker out of his hands, and walked away. Antonio's testimony was corroborated by the video of the offense. See *cf. Naylor*, 229 Ill. 2d at 608 (finding the evidence was closely balanced where it was the defendant's word against that of two police officers and there was no corroborating evidence). The jury was able to hear Antonio's testimony and view the video and considering all the evidence, the jury decided to find defendant guilty. This was not a case where defendant's guilt hinged solely on the credibility of the witnesses. See *Sebby*, 2017 IL 119445, ¶ 63. Despite defendant's assertions otherwise, evidence of his guilt was strong and not closely balanced. "[D]efendant must meet his burden to show that the error was prejudicial—in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *Piatkowski*, 225 Ill. 2d at 566 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). Thus, defendant cannot establish the evidence, as he alleges, was so closely balanced that the error threatened to tip the scales of justice against him.

¶ 34    Defendant next asserts in a conclusory fashion that this error affected the fairness of his trial because the hearsay evidence violated his constitutional right to confront witnesses against him. The State responds that defendant had a fair trial where defense counsel thoroughly cross-examined Detective Allen and Antonio.

¶ 35    Our review of the evidence reveals that defendant received a fair trial. When Detective

Allen was asked how he learned of defendant's address and Detective Allen responded from his "prior arrest record," defense counsel objected and the objection was sustained. The trial court then instructed the jury to disregard Detective Allen's response. Indeed, on later reflection, the trial court indicated that it believed the jury was receptive to its admonishments related to disregarding this evidence. See *People v. Monroe*, 366 Ill. App. 3d 1080, 1092 (2006) (prejudice cured when court sustained objection to improper testimony, gave instruction to jury to disregard improper testimony, or offered to give jury instruction but counsel ultimately requested it not be given). Moreover, as to Detective Allen's testimony regarding obtaining the defendant's address from the website of the Cook County Assessor, defense counsel did effectively cross-examine him as to how he performed the search and elicited that defendant was not the owner of the property. As the trial court properly admonished the jury, defense counsel effectively cross-examined Detective Allen, and the fired cartridge cases were cumulative, we find defendant fails to meet his burden to prove that sufficient prejudice resulted from this error so as to require a new trial.

¶ 36                                  Ineffectiveness of Counsel

¶ 37    Defendant maintains, in the alternative, that defense counsel was ineffective for failing to lodge a specific hearsay objection to Allen's testimony. We begin with the familiar principles for resolving claims of ineffective assistance as provided by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that his counsel's performance was deficient and that he was prejudiced as a result. *Id.* at 687. To demonstrate deficient representation, a defendant must establish his counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. Judicial scrutiny of a counsel's performance is highly deferential, such that a court must indulge in a strong presumption that the

counsel's conduct fell within the wide range of professional assistance. *Id.* at 689. To demonstrate prejudice, the defendant must establish there is a reasonable probability that, but for counsel's deficient representation, the result of the proceeding would have been different. *Id.* at 694. The Supreme Court advised that "[a] reasonable probability is a probability sufficient to undermine the confidence in the outcome" of the proceeding. *Id.* Moreover, because the defendant must satisfy both parts of the *Strickland* test, if an ineffective assistance claim can be disposed of on the ground of lack of sufficient prejudice, a court need not consider the quality of the attorney's performance. *Id.* at 697. Our supreme court has further advised that the right to effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). In other words, *Strickland* only requires a fair trial for the defendant; one that is free of errors so egregious that they, in all probability, caused the conviction. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 101.

¶ 38    As discussed previously, no prejudice resulted from the admission of Detective Allen's hearsay testimony to require a new trial. Accordingly, defendant also fails to demonstrate prejudice under an ineffective assistance of counsel argument. See *People v. White*, 2011 IL 109689, ¶ 134.

¶ 39                              *Krankel* Inquiry

¶ 40    Defendant next argues that the trial court's inquiry into his *pro se* allegations of ineffective assistance of counsel was inadequate where the trial court failed to inquire about the claim that defendant's counsel failed to obtain evidence and did not properly assess his claims regarding the incomplete cross-examination of Antonio. According to defendant, the trial court's inadequate inquiry requires the matter to be remanded to the trial court for a new preliminary hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 41    In response, the State maintains that the trial court conducted an adequate inquiry into defendant's claims of ineffective assistance of counsel.  The State observes that the trial court asked questions regarding defense counsel's alleged failings in cross-examining Antonio and that the record disclosed that defense counsel obtained the phone records in discovery.  According to the State, the trial court properly denied the motion based on its questioning of defendant and its knowledge of the procedural history and facts of the case.

¶ 42    It is axiomatic that *pro se* posttrial claims alleging ineffective assistance of counsel are governed by the common-law procedure that has developed from our supreme court's decades-old decision in *Krankel*.  *People v. Jackson*, 2020 IL 124112, ¶ 95.  This procedure "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" and to promote the consideration of such claims in the trial court so as "to limit issues on appeal."  (Internal quotation marks omitted.)  *Id.*  (quoting *People v. Patrick*, 2011 IL 111666, ¶¶ 39, 41).

¶ 43    *Krankel* is triggered whenever a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel.  *People v. Jolly*, 2014 IL 117142, ¶ 29.  The defendant is not required to file a written motion in the trial court but may raise the issue orally or through a letter or note to the court.  *People v. Ayres*, 2017 IL 120071, ¶ 11.  Nonetheless, new counsel is not automatically appointed in every case.  *Jackson*, 2020 IL 124112, ¶ 97.  Rather, upon the raising of such a claim, the trial court must employ a two-step procedure.  *Id.*  First, the court conducts a preliminary examination of the factual basis underlying the defendant's claim—the so-called *Krankel* inquiry.  *Id.*  During this preliminary evaluation, the trial court is permitted to question defense counsel about the facts and circumstances surrounding the defendant's allegations, engage in a discussion with the defendant, or rely on its own knowledge of counsel's

performance at trial and the insufficiency of the defendant's allegations. *Ayres*, 2017 IL 120071, ¶ 12 (citing *Jolly*, 2014 IL 117142, ¶ 30; *People v. Moore*, 207 Ill. 2d 68, 78-79 (2003)).

¶ 44    If, during this preliminary inquiry, the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, the court need not appoint new counsel and may deny the *pro se* motion. *Ayres*, 2017 IL 120071, ¶ 11; *Jolly*, 2014 IL 117142, ¶ 29.  A claim lacks merit if it is conclusory, misleading, or legally immaterial, or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71.  If, however, the court finds that the allegations demonstrate "possible neglect of the case," new counsel must be appointed to represent the defendant at the next stage of the proceeding—*i.e.*, the hearing on the defendant's *pro se* claim of ineffective assistance of counsel. *Ayres*, 2017 IL 120071, ¶ 11.  The appointed counsel can then independently evaluate the defendant's ineffectiveness claim and avoid any conflict of interest that might arise were trial counsel forced to justify his or her actions contrary to the defendant's position. *Jackson*, 2020 IL 124112, ¶ 97.

¶ 45    The applicable standard of review depends on whether the trial court determined the merits of the defendant's *pro se* posttrial claim of ineffective assistance of counsel. *Jackson*, 2020 IL 124112, ¶ 98.  The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance. *Id.*  Accordingly, if the reviewing court is asked to determine whether the trial court properly conducted a *Krankel* inquiry, the standard of review is *de novo*, *i.e.*, we perform the same analysis that a trial judge would perform. *Id.*  If, on the other hand, after performing the *Krankel* inquiry the trial court reaches a determination as to the merits of the defendant's ineffective assistance of counsel claim, the reviewing court may reverse only if the trial court's action was

manifestly erroneous, *i.e.* it was clearly evident, plain and indisputable. *Id.* Moreover, even if the reviewing court finds error, it will not reverse if the error was harmless, and the record is sufficient to permit a harmless error analysis of the trial court's ruling. *Id.*; see *Moore*, 207 Ill. 2d at 80-81.

¶ 46 In the present case, defendant contends that the trial court did not conduct an adequate *Krankel* inquiry because it failed to: (1) inquire about the claim that his trial counsel failed to obtain the phone records; and (2) properly assess defendant's claims regarding what was contained in the grand jury testimony and what information defendant believed was not pursued. In support, defendant relies solely on *People v. McLaurin*, 2012 IL App (1st) 102943. For the reasons which follow, we disagree that the trial court's inquiry was inadequate and find *McLaurin* inapposite.

¶ 47 Initially, we reiterate that the purpose of a *Krankel* inquiry is to create a record and potentially limit issues on appeal, and the trial court's goal in reaching this purpose is to ascertain the underlying factual basis of the defendant's claims of ineffective assistance and give him the chance to explain and support those claims. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. The method a trial court may employ to achieve this goal is a flexible one. See *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 84. Indeed, our courts have repeatedly observed that at this stage of the *Krankel* proceedings the trial court may base its decision on: (1) trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant;" or (3) the trial court's own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. Therefore, contrary to defendant's position, there is no requirement that the trial court must orally review every single one of defendant's claims and memorialize them for the record or make express inquiries of

defense trial counsel. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. Rather, the trial court must simply "afford" the defendant an opportunity to explain and support his claims of ineffective assistance. See *id.* While some may consider the address of each claim individually to be a better practice than denying all claims outright after an inquiry, *Krankel* and its progeny do not expressly require this—only that the proper inquiry take place.

¶ 48    With these principles in mind, our review of the record reveals that the trial court conducted an adequate *Krankel* inquiry. Here, defendant raised two claims of ineffective assistance of counsel; that defense counsel failed to obtain phone records and that she did not effectively cross-examine Antonio. As previously discussed, the trial court may base its decision on: (1) trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant;" or (3) the trial court's own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. In this case, the trial court had a brief discussion with defendant and based its decision on this discussion and its own knowledge of the trial record. As noted by the State, the record reveals that the phone records were tendered in discovery and defense counsel informed the trial court prior to the trial that she was investigating those records. The fact that, after a review of those records, trial counsel did not offer to admit them into evidence or question Antonio about them is a matter of trial strategy. See *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (observing that decisions concerning which witnesses to call at trial and what evidence to present on a defendant's behalf ultimately rest with trial counsel and are considered matters of trial strategy that are generally immune from claims of ineffective assistance of counsel). Defendant argues that without the trial court personally inquiring of defense counsel whether or not she investigated the phone records there is "no assurance" that she did so. Defendant misstates the

standard. As noted in *Moore*, the trial court *may* speak with trial counsel; there is no requirement that defense counsel be questioned during the *Krankel* inquiry. As explained in *Moore*, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. We observe that in making this statement our supreme court did not set forth a blanket requirement that each *Krankel* inquiry must involve the trial court speaking with defense counsel. It is evident from our well-established case law that the trial court may rely on other bases for its determination aside from querying defense counsel. See *id.*; *Ayres*, 2017 IL 120071, ¶¶ 13, 24.

¶ 49    Regarding the cross-examination and impeachment of Antonio, the record demonstrates that this too was a matter of trial strategy. Antonio was heartily cross-examined regarding his prior convictions, prior (and numerous) inconsistent statements to the police about the shooting, and his inconsistent grand jury testimony. The record further demonstrates that Antonio was questioned by defense counsel regarding his initial statement to police that he was at the location of the shooting to get some money and that he was further questioned regarding his phone calls with defendant. The manner and extent of cross-examination are matters of trial strategy that will not ordinarily support an ineffective assistance of counsel claim. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). In this case, the record of the trial, over which the same trial judge presided, established that defendant's claims of ineffective assistance were matters of trial strategy. Accordingly, in light of the record, the trial court's *Krankel* inquiry was proper.

¶ 50    In reaching this conclusion, we have considered *McLaurin*, the only case defendant relies on in support of his position and find it to be inapposite. In *McLaurin*, the State and the defense

were both interested in the testimony of a potential defense witness who would have disputed that either the defendant or the State's principal eyewitness had been at the scene of a shooting, which led to the defendant's charge for first-degree murder. *McLaurin*, 2012 IL App (1st) 102943, ¶ 6. Prior to trial, the defendant's private trial counsel sought an extension because he could not locate this witness, and counsel admitted that he had "no excuse other than [his] schedule and workload." *Id.* The trial court granted the continuance, stating that the defendant "deserved to have a lawyer who would investigate his case" and that "counsel's efforts to locate *** [this witness] up to that time were not due diligence." *Id.* The witness, however, ultimately never testified at the trial and the trial court declared a mistrial after the jury could not reach a verdict. *Id.* ¶ 7. At the defendant's second trial, the witness again did not testify even though the trial court notified the venire that he "was a potential witness in the case." *Id.* ¶ 8. Neither party, nor the trial court, discussed the witness' whereabouts or any efforts to locate him. After the jury found the defendant guilty of first-degree murder, the defendant raised a *pro se* claim of ineffective assistance based on counsel's failure to secure the witness' testimony at retrial. *Id.* ¶¶ 33-34. The defendant specifically noted the trial court's comments about the witness prior to the first trial. *Id.* ¶ 34. During the inquiry hearing, defense counsel stated that he spoke to the witness, who was out of state, prior to the first trial and said he would come to court but did not appear. *Id.* The trial court, without ever discussing with the defendant or defense counsel any efforts made to secure the witness for the second trial, ruled that this did not amount to ineffectiveness because the witness was out of state and could not be subpoenaed by defense counsel. *Id.*

¶ 51    On appeal, the *McLaurin* court remanded for a new inquiry, finding that the trial court had not conducted a proper preliminary *Krankel* inquiry. *Id.* ¶¶ 39-55. In addition to finding

that the trial court had ignored the Illinois Witness Attendance Act (725 ILCS 220/3 (West 2008)), which authorizes Illinois courts to issue subpoenas of out-of-state witness, the *McLaurin* court held that the parties and the trial court had known since the first trial that the witness was crucial to the defense. *Id.* ¶¶ 50-51. The *McLaurin* court specifically noted that while the trial court had initially directed defense counsel to conduct an investigation into the witness, after the second trial, it never inquired into that investigation and in fact, never mentioned this witness at all. *Id.* ¶ 52. Because of this, and because there was "not enough in the record" to evaluate the defendant's claim of ineffective assistance, the *McLaurin* court remanded the matter "for the limited purpose of allowing the trial court to make a more complete inquiry into" defense counsel's efforts "to investigate" the witness and "secure his testimony for the second trial." *Id.* ¶ 53. The present case is inapposite as it does not involve the trial court's explicit direction to locate certain witnesses or the trial court's misapprehension of law.

¶ 52     In sum, the trial court's inquiry was adequate as the record, to which the trial court was privy, demonstrates that defendant's claims of ineffective assistance of counsel were matters of trial strategy. See *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997); *People v. Crane*, 145 Ill. 2d 520, 533 (1991) (no *Krankel* hearing is required when a defendant's claim of ineffective counsel relates to counsel's trial tactics).

¶ 53                                  CONCLUSION

¶ 54     For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 55     Affirmed.